**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KEVIN LEE CHITTICK,

               Petitioner,                   Case Number: 08-14910

v.                                    HONORABLE GERALD E. ROSEN

BLAINE C. LAFLER,

               Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS AND DENYING CERTIFICATE OF APPEALABILITY

Petitioner Kevin Lee Chittick has filed a petition through counsel for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is currently incarcerated at the Carson City Correctional Facility in Carson City, Michigan. He claims that the prosecution's invasion of the attorney-client privilege deprived him of his right to counsel and that counsel was ineffective in handling the issue. He also claims that counsel was ineffective in failing to protect him from inadmissible other acts evidence. For the reasons set forth below, the Court denies the petition.

## I.  Facts

Petitioner was charged with eight counts of criminal sexual conduct first-degree, six counts of criminal sexual conduct second-degree, five counts of criminal sexual conduct fourth-degree, and one count of neglect of duty by a public officer. As to the first-and-second-degree charges, a jury convicted Petitioner of 14 counts of the lesser

included offense of criminal sexual conduct third-degree.  The jury also convicted him of the remaining charges.

The conduct leading to these convictions occurred between late summer 2001 and late fall 2002.  The victim, Monica Ruhlman, who was 13 to 14 years old at the time of the offenses, came forward to police in January 2004.

Monica was 16 years old at the time of trial.  She testified that she first saw Petitioner, who was a deputy sheriff with the Lapeer County Sheriff's Department, during bike rides with her younger brother.  She saw the same silver police car nearly every day for two weeks.  At the end of the second week, Petitioner visited Monica's house purportedly to investigate a report of a missing girl who was around Monica's age and had a similar last name.  During this visit, Monica's mother and Petitioner discovered that Petitioner's wife's family and Monica's mother's family were long-time friends.  When Petitioner left, he promised to visit more often.

Soon thereafter, Petitioner began visiting the Ruhlman home once a week. Gradually, the visits increased to two to three times a week until, eventually, he was visiting every day.  He was usually in uniform.  He often came bearing small gifts for Monica and her four younger siblings.  Over time, Petitioner, his wife, and the Ruhlman family became close friends.

In December 2001, Petitioner and his wife watched Monica and her siblings at their home while Mr. and Mrs. Ruhlman were out of town.  Monica testified that she slept over at Petitioner's home at least five or six times between December 2001 and March or

2

April 2002.  Monica was always with one or more of her siblings or a friend.

Monica testified that, on the first or second overnight visit to Petitioner's home, she watched a movie with Petitioner and his wife, Angela.  Angela snuggled with Petitioner.  Monica testified that Petitioner encouraged her to do the same.  She thought it was odd, but did so anyway.  That night, Monica slept on the floor.  She testified that she was drifting off to sleep when Petitioner kissed her on the lips.  She did not open her eyes, pretending that nothing happened.  The next night, when Petitioner cracked Monica's back, he grabbed her breasts instead of her arms.  Petitioner then started to make comments and touch her in ways that made her feel uncomfortable.  He sometimes complimented her breasts or bottom, held her hand, and kissed her on the cheek, neck, or hand.

Monica testified that on her second visit to Petitioner's home, she and Petitioner played a computer game in the basement.  One of the games involved looking at breasts and determining whether they were real or implants.  Monica testified that, at one point, Petitioner locked the basement door and pinned Monica to the floor by her wrists.  He removed their clothes.  She kicked, bit, and pinched, telling him to stop.  Petitioner gave Monica what she described as a pep talk, telling her to relax, that sex was supposed to be enjoyable, and that it would not be painful.  Monica testified that Petitioner digitally penetrated her, performed oral sex on her, and started to penetrate her, but stopped.  Thereafter, every time Monica visited Petitioner's home, similar incidents occurred.  Monica could not always recall where Petitioner's wife or her siblings were.  She testified

3

that her brother often played video games upstairs, that her younger siblings took naps, and that Petitioner's wife, Angela, was often in and out of the house.

On another occasion, Petitioner forced her to perform oral sex. She had never seen an erect penis before. She described it as having a purplish ring. Petitioner told her it was from a botched circumcision. Monica testified that she did not tell anyone about these encounters because she was scared and nervous.

In March 2002, Monica's and Petitioner's families took a trip to Florida. The men and women drove separately. The middle seats of the Ruhlman van were removed so that Monica's father and Petitioner could rest in between driving shifts. Around 3:00 p.m., when it was Petitioner's turn to rest, Monica testified that Petitioner pulled her arm to get her to join him on the floor. Petitioner and Monica laid down under a blanket and had a sexual encounter.

While on the Florida vacation, Monica testified that, on one occasion, she and Petitioner swam farther into the ocean than everyone else. Petitioner pulled Monica's bathing suit bottom down and briefly entered her.

The day before the Florida trip, Petitioner overheard Monica tell her mom that she had a yeast infection. Monica testified that Petitioner followed her to her room and told her that she should have come to him. He told her that he and Angela had herpes, and that she probably did as well. When Monica became angry, Petitioner started crying and apologized. Thereafter, Petitioner occasionally brought Monica Balmex containers which he supposedly filled with herpes cream. Monica testified that the cream seemed to lessen

4

her symptoms.

Also after the Florida trip, Monica testified that her parents fought about Petitioner's visits. Monica's father felt that Petitioner was trying to take over the family. In May 2002, Monica's mother wrote Petitioner a letter indicating that he should stop visiting. The forced separation angered Monica because she felt Petitioner was the only person she could trust. After that, Monica continued to see Petitioner without her parents' permission.

Monica testified that, during the summer of 2002, she spent a lot of time at her friend Connie Cheladyn's farm. Petitioner purchased a horse to house there, and visited the farm at least three times a week. The night before a Fourth of July camping trip, Petitioner, Monica, and Connie swam in Connie's pool. Monica testified that Petitioner pulled down her bathing suit bottoms and entered her when Connie was diving for an object. The following day, Petitioner, Monica and Connie's family went camping. Petitioner, Monica, and Connie slept in a two-person tent. After Connie fell asleep, Monica testified that Petitioner pulled her into his sleeping bag and they had intercourse that night and the following night.

Monica testified that, at least once, she, Petitioner, and Connie played Truth or Dare in the Cheladyn's hayloft where they could not be seen. They created a hang-out there with sleeping bags. Monica estimated that that she and Petitioner engaged in intercourse at least six times at Connie's home.

Monica testified that she communicated with Petitioner using a cell phone and

5

phone card that Petitioner had supplied.  Connie kept the cell phone so that Monica's mother would not find it.  When Petitioner visited Monica at the Cheladyn's, he parked his car behind a barn so that it could not be seen.

The sexual acts with Petitioner stopped sometime after Monica started high school. Monica testified that in the spring of 2003, when Petitioner happened to be visiting her former teacher, Jennifer Hubbell, Petitioner pulled Monica aside and asked her why she was not talking to him.  Monica testified that she had grown tired of Petitioner because he only talked about sex and his compliments made her feel "trashy."

A few days later, Petitioner called Hubbell and asked her to bring Monica to meet him after school.  Hubbell did so.  Monica testified that she and Petitioner spoke privately in Petitioner's car for about fifteen minutes, arguing about why Monica was not talking to Petitioner.  Monica told him she was going to confess about their relationship.  Petitioner became angry, and began crying and yelling.  Monica testified that when she left, Petitioner grabbed her arm and said, "Don't do this."

Monica told Hubbell about her relationship with Petitioner the next day.  When she did, the teacher became upset.  Monica testified that she suspected that Hubbell did not believe her.  Around that time, Monica also told her friend Connie about her relationship with Petitioner.  When Connie did not believe Monica, she believed that nobody would. Monica did not tell anyone else until the late fall of 2003 when she revealed to her aunts that she had herpes and that Petitioner was the source.

The aunts arranged a meeting with Detective Sergeant Brian Ferguson.  Monica

6

testified that she met with him multiple times.  Initially, Monica had been reluctant to come forward because she felt ashamed.  Monica also testified that following a blood test, she learned that she did not have herpes.

Monica's friend, Connie Cheladyn, testified that she met Petitioner in March 2001 when Petitioner picked her and Monica up from school.  She testified that Monica and Petitioner spent a lot of time together.  When playing computer games, Monica always sat on Petitioner's lap.  When they sat down anywhere else, they were right next to each other.

Connie testified that, during the late night swim before the camping trip, Petitioner tried to take off both Monica's and Connie's bathing suits.  Monica's top came off a couple of times.  When Connie was swimming underwater, Petitioner pulled her bottoms down to her knees and brushed her crotch with his fingers.  Connie testified that, at one point, Petitioner took off Connie's swimsuit and threw it across the pool.

While on the camping trip, Connie saw Petitioner and Monica sleeping in the same sleeping bag.  When they rode horses, Petitioner and Monica sometimes doubled up on one horse.  Connie testified that when Petitioner rode behind Monica, he often grabbed her breasts, joking that he was holding on.

She further testified that, when Petitioner and Monica were at Connie's family's farm, she sometimes saw them kiss in the hayloft.  There were times when she was sent away.

Connie testified that she was skeptical when Monica first opened up to her.  But

7

after considering all she had heard and seen in the preceding months, she came to believe the allegations.

Mary Ruhlman, Monica's mother, testified that Petitioner was fun to be around and she had considered him a friend.  During the Florida trip, Monica and Petitioner spent so much time together that Mrs. Ruhlman and her husband felt uneasy.  They decided to cut-off contact with Petitioner and Mrs. Ruhlman wrote Petitioner a letter to explain. Petitioner visited less at first, but was eventually visiting every day again.

In April, Mrs. Ruhlman and Petitioner e-mailed one another several times about the forced separation.  Petitioner conveyed that he was distraught and felt like he was going to die.  In a final e-mail, Mrs. Ruhlman told Petitioner not to contact the family. Thereafter, Mrs. Ruhlman blocked Petitioner's e-mail address from their home computers.  She also told Jennifer Hubbell and Connie's parents that Petitioner was not allowed to see Monica.

Connie's mother, Mary Jo Cheladyn, testified that she met Petitioner in the spring of 2002.  He introduced himself as Monica's uncle and asked if he could visit Monica at the farm.  Petitioner explained that he needed to see Monica at the farm because a family feud prevented him from seeing her at her home.  Petitioner told Mrs. Cheladyn that Monica needed guidance, that she was a slave at her parent's house, that Mary Ruhlman had a crush on Petitioner, and that the Ruhlmans often made comments about Mrs. Cheladyn's parenting.  Mrs. Cheladyn testified that, at the time, she found Petitioner to be very caring.  After that, Petitioner visited often.  Petitioner acted like he was 15 years old

8

around Monica and Connie.

Michael Cheladyn, Connie's older brother, testified that he once saw Monica and Petitioner lying together on the couch. He thought it was strange so he told his mom about it. Cathy Severance, Mary Ruhlman's sister, testified that she saw Monica and Petitioner sitting on the couch with a blanket over them at a family gathering. She thought that was odd and voiced her concern to Monica's mother.

Jennifer Hubbell, Monica's eighth grade science teacher, met Petitioner through Monica. Monica dropped Petitioner's business card on her desk and told her that Petitioner wanted to speak to the students about school safety. Hubbell did not call Petitioner, but he nevertheless appeared at the school to make the arrangements. After Petitioner spoke to the students, Hubbell and Petitioner became friends. At one point, Monica appeared in Hubbell's classroom sobbing. She explained she had been forbidden to see Petitioner anymore because her dad suspected Petitioner was having an affair with her mother.

Around this time, Petitioner asked Hubbell if he could see Monica so that he could tell her that the separation was not her fault. Hubbell testified that she facilitated three visits between Petitioner and Monica at her home. Hubbell testified that Monica's demeanor towards Petitioner changed abruptly in the spring of 2003. Monica refused to speak with Petitioner. Hubbell agreed to bring Monica to see Petitioner after school. After they spoke, Petitioner looked shocked and Monica appeared angry. Petitioner called Hubbell a few days later and revealed that Monica was accusing him of rape.

9

Dr. Rodney Pattan, a family practice physician, testified that Petitioner did not have an abnormal circumcision, nor a prominent purplish ring. He did, however, testify that Petitioner had a noticeable bluish vein. And also that, if rubbed vigorously, a man's penis can appear red or discolored.

Detective Sergeant Brian Ferguson testified that he was employed by the Michigan State Police and the lead investigator in this case. He testified that it is common for children to delay reporting CSC incidents and for their accounts to become more detailed over time. He also testified that a January 2004 search of Petitioner's home revealed no trace evidence of Monica's DNA, nor was her DNA found in the Ruhlman van. Petitioner's DNA was found on a six-foot square piece of carpet taken from the middle of Petitioner's basement and on the basement couch cushions. Blood samples revealed that both Petitioner and his wife had genital herpes; Monica did not. Ferguson testified that studies have shown that the transmission rate between couples where one has HSV-2 antibodies and the other does not is about 10 percent per year.

Detective Ferguson executed a search warrant at Petitioner's home on May 4, 2004. Petitioner's home computer was seized pursuant to the search warrant. The computer was taken to the computer crime lab for analysis. Detective Ferguson was informed by the technician that a product called "Evidence Eliminator" had been installed on the computer. Detective Ferguson explained that deleted files and information typically remain on a computer's hard drive, but in a form inaccessible to the average user. Evidence Eliminator deletes information that has remained on a computer hard

10

drive despite being deleted by the user.  No emails remained on the computer.  Only the previous two days of internet usage remained on the computer.  Computer specialists found e-mails between Petitioner and Mary Ruhlman, as well as password-protected documents that contained Petitioner's and his wife's version of the events relating to his relationship with Monica.  All of the information retrieved from Petitioner's computer was turned over to the prosecutor.  The prosecutor later told Ferguson that he should not have turned over the privileged documents.

Detective Ferguson further testified that no missing persons reports for a girl as described by Petitioner when he visited the Ruhlman house had been received in 2001.

Angela Chittick, Petitioner's wife, was 24 years old at the time of trial and had been married to Petitioner for four years.  She testified that she and Petitioner were devastated when they were cut-off from the Ruhlman children.  They thought of them as their babies.  Because they felt that Monica was troubled and from a dysfunctional family, they decided to keep in touch with her through Jennifer Hubbell.  Angela further testified that her younger sister, Gloria, once told her that Petitioner made fun of her underwear, which made her feel uncomfortable, and that he had once place his hand on her belly in a way that also made her uncomfortable. Angela testified that she was not aware that Petitioner ever snuck out of bed at night, but that it was possible.

## II.  Procedural History

Following a jury trial in Lapeer County Circuit Court, Petitioner was convicted of fourteen counts of criminal sexual conduct third-degree with a person at least 13 years of

age and under 16 years of age, Mich. Comp. Laws § 750.520d(1)(a); five counts of criminal sexual conduct fourth-degree with a person at least 13 years of age and under 16 years of age, Mich.  Comp. Laws § 750.520e(1)(a); and one count of willful neglect of duty by a public officer, Mich. Comp. Laws § 75.478.  On July 12, 2005, Petitioner was sentenced to concurrent sentences of seven  years, 11 months to 15 years in prison for each third-degree criminal sexual conduct conviction, 16 to 24 months in prison for each fourth-degree criminal sexual conduct conviction, and 270 days in prison for the willful neglect of duty conviction.

Thereafter, Petitioner filed an appeal of right with the Michigan Court of Appeals raising the same two claims presented on habeas review.  The Michigan Court of Appeals affirmed Petitioner's conviction and sentence.  *People v. Chittick*, No. 04-008257-FC, 2007 WL 838924 (Mich. Ct. App. March 20, 2007) (unpublished).  Petitioner then filed an application for leave to appeal with the Michigan Supreme Court, which was denied. *People v. Chittick*, 480 Mich. 928, 740 N.W.2d 297 (2007).  Dissenting Justices Michael F. Cavanagh and Marilyn J. Kelly indicated that they would remand the case for a hearing pursuant to *People v. Ginther*, 390 Mich. 436 (1973).  *Id.*

Petitioner thereafter filed the present habeas petition, raising the following claims as grounds for relief:

I.      The prosecutor violated Petitioner's Sixth Amendment right to counsel by seizing and examining Petitioner's written account of the events in question, prepared for the sole purpose of helping his lawyer prepare for trial.

12

II.    Trial counsel provided Petitioner ineffective assistance of counsel by failing to protect him from a violation of his attorney client privilege and from inadmissible other acts evidence.

Respondent has filed an answer to the petition contending that it should be denied.

### III.  Standard of Review

Petitioner's claims are reviewed against the standards established by the

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat.

1214 (AEDPA).  The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a

rule that contradicts the governing law set forth in [Supreme Court cases]' or if it

'confronts a set of facts that are materially indistinguishable from a decision of [the

Supreme] Court and nevertheless arrives at a result different from [this] precedent.'"

*Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (*quoting Williams v. Taylor*,

529 U.S. 362, 405-06 (2000)).  "[T]he 'unreasonable application' prong of the statute

permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (*quoting Williams*, 529 U.S. at 413). However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 789 (2011), *quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87 (internal quotation omitted).

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See*

*Williams*, 529 U.S. at 412. Section 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). "[W]hile the principles of "clearly established law" are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007), *citing Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002).

Lastly, a federal habeas court must presume the correctness of state court factual determinations. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

## IV.  Analysis

### A.  Sixth Amendment Right to Counsel

In his first habeas claim, Petitioner argues that his Sixth Amendment right to counsel was violated when, pursuant to a search warrant, police seized Petitioner's personal computer containing information protected by the attorney-client privilege. At the time of the seizure, Petitioner told Detective Sergeant Brian Ferguson that the computer contained privileged documents. According to Petitioner, the documents contained Petitioner's and his wife's version of the events related to his relationship with

15

Monica, including Petitioner's impressions of the police reports and other discovery materials, the potential strengths and weaknesses of the Prosecution's case, an assessment of potential defense witnesses, and suggested questions to ask various witnesses.  On the first day of trial, before jury selection, defense counsel informed the trial court that the state police seized attorney-client privileged documents from Petitioner's computer under the authority of a search warrant a year earlier.  Earlier that day, defense counsel received a four-page report from an investigating detective indicating that most of the documents were opened by a computer specialist and turned over to the prosecutor, who had the opportunity to read them.

Defense counsel proposed to remedy the invasion with a stipulation that the prosecutor not use the privileged information in any way.  The prosecutor agreed.  While recognizing that the privileged information the prosecutor read could not be unread, the trial court accepted the proposed remedy and told the prosecutor to frame each question with the remedy in mind.

Respondent argues that this claim is waived because counsel proposed a remedy to the intrusion into the attorney-client privilege and lodged no objection to the resolution of this issue.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  "Federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits."  *Hudson v. Jones*, 351 F.3d 212, 215 (6th

16

Cir. 2003).  In this case, it would be easier to dispose of Petitioner's claim by analyzing its merits.  The Court declines to address the procedural bar.

"The attorney-client privilege is a creation of common law, and a violation of this privilege generally does not constitute grounds for habeas relief."  *Dye v. Hofbauer*, 197 F. App'x 378, 383 (6th Cir. 2006).  In *Weatherford v. Bursey*, 429 U.S. 545, (1977), the Supreme Court held that to establish a violation of the Sixth Amendment right to counsel ensuing from government intrusion on the attorney-client privilege, a petitioner must show a breach of the privilege *and* that the information gained was used to prejudice the defense.  *Id.* at 552.  *See also*, *U.S. v. Moses*, 337 F. App'x 443, 448 (6th Cir. 2009) ("A Sixth Amendment violation based upon intrusion on the attorney-client relationship only occurs if prejudice is shown."); *U.S. v. Irwin*, 612 F.2d 1182, 1186-87 (9th Cir. 1980) ("From *Weatherford* . . . it is apparent that mere government intrusion into the attorney-client relationship, although not condoned by the court, is not itself violative of the Sixth Amendment right to counsel.  Rather, the right is only violated when the intrusion substantially prejudices the defendant.").  "[A] showing of prejudice is required even where there is an intentional intrusion by the government into the attorney-client relationship."  *Moses*, 337 F. App'x at 449.  *See also Lakin v. Stine*, No. 99-1529, 2000 WL 1152 * 4 (6th Cir. July 13, 2000) (holding that Supreme Court precedent rejects a *per se* rule which would find a Sixth Amendment violation based solely on an intrusion into privileged attorney-client privilege, even where such intrusion was purposeful or intentional).

In this case, there was an intrusion into the attorney-client privilege. To obtain habeas relief, Petitioner must show resulting prejudice. Interference with the attorney-client relationship can prejudice a defendant when the information gained is used against a defendant at trial. *Sinclair v. Schriber*, 916 F.2d 1009, 1114 n.2 (6th Cir. 1990), *citing United States v. Irwin*, 612 F.2d 1182 (9th Cir. 1980). Prejudice can also result from "'the prosecution's use of confidential information pertaining to the defense plans and strategy, from government influence which destroys the defendant's confidence in his attorney, and from other actions designed to give the prosecution an unfair advantage at trial.'" *Id. quoting Irwin*, 612 F.2d at 1187.

Petitioner argues that he was prejudiced by the intrusion because the prosecutor received and reviewed privileged information regarding defense strategy. He suggests that the prosecutor used information from the privileged documents to inform the prosecution's approach at trial, but fails to cite any specific examples in support of this argument. Petitioner claims that the prosecutor's cross-examination of Petitioner's wife, Angela Chittick, was guided by what was learned from the privileged documents. However, he fails to identify any specific point in the cross-examination or provide any further detail other than a vague allegation to support this claim.

In *United States v. Green*, 962 F.2d 938, 941 (9th Cir. 1992), the Ninth Circuit Court of Appeals held that no Sixth Amendment violation occurred where defense strategy was conveyed to the prosecutor because there was no indication that the defendant's ability to mount a defense was impaired or that the government utilized the

18

information in any way.  Similarly, in *Gherity v. Swenson*, No. 04-cv-102, 2009 WL 2486171, *16 (D. Minn. August 11, 2009), the District Court of Minnesota held that a vague suggestion that the prosecution gained some tactical advantage from reading privileged material was insufficient to establish prejudice where the petitioner failed to explain specifically what that advantage could have been.  Likewise, in Petitioner's case, he makes only vague arguments which fail to identify any specific aspect of the trial affected by the breach of the privilege.  Additionally, the prosecutor did not introduce any evidence at trial that was improperly obtained.  Petitioner's arguments fail to establish any prejudice resulting from the breach of the privilege.  *Accord Reali v. Abbot*, 90 F. App'x 319, 323 (10th Cir. 2004) (finding no prejudice where petitioner failed to support claims of prejudice with "citations to record evidence demonstrating the purported prejudice actually occurred").

Moreover, Petitioner's arguments that counsel did not learn of the seizure until the start of trial do not persuade the Court that prejudice has been shown.  Petitioner was present when his computer was seized on May 4, 2004, and he specifically advised the seizing agents that privileged information was contained on the computer.  Thus, he had sufficient information to inform his attorney about the possibility that a privilege had been breached.  Petitioner does not claim that inquiries were made prior to trial of the prosecution regarding this privileged material or that the prosecution failed to comply with discovery orders.  It does not seem plausible that Petitioner would fail to mention the seizure to his attorney if it contained information he believed would prejudice his defense.

19

In a further attempt to establish prejudice, Petitioner focuses on the propriety of the prosecution team's conduct.  While the prosecution team's conduct is not to be condoned, it does not excuse the prejudice requirement.

Because there is no indication that Petitioner's ability to defense himself was impaired or that the prosecutor used the privileged information in any way, the Court finds no Sixth Amendment violation.

### B.  Alleged Ineffective Assistance of Counsel

Petitioner's second claim is that his trial counsel provided him with ineffective assistance by failing to protect him from the violation of his attorney-client privilege and inadmissible other acts evidence.

The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel.  *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.  An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has]

20

emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction [or sentence] resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, __ U.S. __, 130 S. Ct. 1473, 1485 (2010).

> [T]he *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S. at 689-90. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. . . . The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S. at 690.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct.

21

> 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138
> L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly"
> so, *Knowles*, 556 U.S., at ___, 129 S.Ct. at 1420. The Strickland standard is
> a general one, so the range of reasonable applications is substantial. 556
> U.S., at ___, 129 S.Ct. at 1420. Federal habeas courts must guard against
> the danger of equating unreasonableness under *Strickland* with
> unreasonableness under § 2254(d). When § 2254(d) applies, the question is
> not whether counsel's actions were reasonable. The question is whether
> there is any reasonable argument that counsel satisfied *Strickland's*
> deferential standard.

*Richter*, ___ U.S. ___, 131 S. Ct. at 788.

First, Petitioner argues that his attorney was ineffective in failing to object to the

prosecution's invasion of the attorney-client privilege. Specifically, Petitioner contends

that the entire trial was pervasively tainted by the invasion and that defense counsel was

ineffective for not seeking either a different prosecutor or outright dismissal.

The Michigan Court of Appeals held that defense counsel's failure to object did not

deprive Petitioner of effective assistance of counsel.

> Defense counsel recognized that the material at issue in this case consisted
> almost entirely, if not entirely, of defendant's self-serving statements and
> that the statements would likely not be admissible at trial. Defense counsel
> agreed that any impropriety in the prosecutor's viewing of the privileged
> documents could be remedied by the prosecutor's agreement not to use at
> trial any of the information gleaned from the documents. Conspicuously
> absent from defendant's briefs is any proof that the prosecutor used any of
> this information at trial, much less any proof that defendant was prejudiced
> by the use of the information. Under these circumstances, defendant has
> failed to show plain error affecting his substantial rights and has failed to
> demonstrate that it is reasonably likely the outcome of the trial would have
> been different absent counsel's agreement to the remedy. *People v. Henry*,
> 239 Mich. App. 140, 145-146; 607 N.W.2d 767 (1999).

*People v. Chittick*, No. 04-008257-FC, 2007 WL 838924, *1 (Mich. Ct. App. March 20,

22

2007).

Although the Supreme Court in *Strickland* discussed the performance prong of an ineffectiveness claim before the prejudice prong, the Court made clear that "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. The Supreme Court instructed that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* In the case at bar, the Court concludes that it is easier to address the prejudice prong first.

As has been discussed more fully above, Petitioner has not pointed to anything in the privileged documents that the prosecutor used at trial to Petitioner's disadvantage. Petitioner merely asserts that the documents revealed valuable defense strategy, thereby prejudicing Petitioner's case. Petitioner has not articulated any strategy that was communicated or how it adversely impacted his defense. Petitioner has not shown that the state court's opinion was contrary to or an unreasonable application of *Strickland*.

In his second claim of ineffective assistance of counsel, Petitioner argues that counsel was ineffective in failing to object to the admission of other acts testimony. Specifically, Petitioner asserts that the other acts testimony was inadmissible because it was hearsay evidence and because the prosecutor did not give advance notice of his intent to use the evidence as required by Michigan Rule of Evidence 404(b)

23

The last defense witness to testify at trial was Petitioner's wife, Angela Chittick. On cross-examination, the prosecutor asked Angela if her younger sister, Gloria, ever complained about the Petitioner. Angela said that Gloria once told her that Petitioner made fun of her underwear, and that on another occasion he put his hand on her belly but took it away when Angela came into the room. Both of these incidents made Gloria feel uncomfortable. Angela also stated on cross-examination that a teenage girl named Sarah stayed with them for a brief time. The girl left on her own, but Petitioner and Angela planned to ask her to leave anyway because she did not come home at night and worried them. Lastly, it was also brought out on cross-examination that on Petitioner's first date with Angela, who was 18 at the time, Petitioner tried to take her bra off. Defense counsel did not object to this line of questioning.

Although not specifically citing *Strickland*, the Michigan Court of Appeals cited caselaw that incorporated the *Strickland* standard. The Michigan Court of Appeals denied relief on this claim finding that: (1) the evidence was properly admitted; and (2) even assuming that it was improperly admitted, defense counsel was not ineffective for failing to object to the other acts evidence because it would be reasonable trial strategy to choose not to focus the jury's attention on this testimony. *People v. Chittick*, 2007 WL 838924 at *2-3.

First, given that the Michigan Court of Appeals held that the challenged testimony was not prohibited by Michigan Rule of Evidence 404(b), defense counsel was not ineffective for failing to raise a meritless objection. Second, even if defense counsel's

24

performance was deficient, Petitioner has not shown that he was prejudiced by the mistake.  The other acts evidence came out on the last day of a six-day trial.  The Michigan Court of Appeals concluded that it was not reasonably likely that, if counsel had objected and the evidence had been excluded, the result of the proceeding would have been different.  This conclusion is not contrary to or an unreasonable application of *Strickland*.

## V.  Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253.  Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §2253(c)(2).  A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (citation omitted).

The Court finds that jurists of reason could find the resolution of Petitioner's claim that his Sixth Amendment right to counsel was violated to be debatable or wrong. Accordingly, the Court grants a certificate of appealability as to this issue.  As to the remainder of Petitioner's claims, the Court concludes that reasonable jurists would not

25

debate the conclusion that the petition fails to state a claim upon which habeas corpus relief should be granted, and denies a certificate of appealability on the remaining claims.

### V. Conclusion

For the reasons stated, the Court concludes that the petitioner is not entitled to federal habeas relief on the claims contained in his petition.  Accordingly, **IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **GRANTED** for Petitioner's claim that his Sixth Amendment right to counsel was violated and **DENIED** for the remaining claims.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  May 26, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 26, 2011, by electronic and/or ordinary mail.

s/Ruth A. Gunther
Case Manager